The Chancellor.
The complainants in this suit are duly incorporated, under an act of the legislature of the state of New York, entitled, “An act to provide for the incorporation of religious societies.” And there are seventeen other Associate Reformed churches in the state of New York, incorporated under the same act, associated witli the complainants, professing the same articles of faith, the same church discipline, and governed by one and the same synod, or church judicatory, called “ The Associate Reformed synod of New York,” and forming a distinct body of Christians, under the general denomination of “The Associate Reformed church.” And their established form of government is presbyterial, having sessions, presbyteries and synods.
In the year eighteen hundred and one, they had thirty congregations, with settled ministers, divided into seven presbyteries, viz.: The presbytery of Washington and of New' York, in the state of New York; the first and second of Pennsylvania; the first and second of Carolinas and Georgia, and one of Kentucky ; and those presbyteries met and formed a synod, called “ The Associate Reformed synod.”
On or about the second of June, A. D., eighteen hundred and one, and before ány of these churches were incorporated, this synod resolved to send the Rev. John M. Mason to Europe “to solicit donations in money for the purpose of erecting and maintaining a theological seminary for the education of youth for the holy ministry,” and “to purchase a library for said seminary, and a collection of those books which are most needful and use *91 ful for this synod, to be distributed among their members and students,” &c.
Under this resolution the said John M. Mason proceeded to Great Britain and collected some moneys and a library, with which he returned to the city of New York in eighteen hundred and two.
Large collections were also made in this country and appropriated to the endowment and establishment of a theological seminary of this church, which was established in the city of New York, and endowed with those books and funds, and with other funds received from time to time.
In eighteen hundred and two, this Associate Eeformed synod was divided into four particular synods, and a general synod was at the same time formed, to hold its first meeting at Green-castle, on the last Wednesday of May, eighteen hundred and four.
This general synod met annually, and the church continued under this organization until eighteen hundred and twenty-two, during all which time this library and the funds of the church, were in the custody of the general synod, who by the consent of the church, exercised a general superintendance over theii property and funds.
In eighteen hundred and twenty-two, the general synod formed an union with the general assembly of the Presbyterian church, by the following articles of agreement.
1. “The different presbyteries of the Associate Eeformed church, shall either retain their separate organization, or shall be amalgamated with those of the general assembly, at tlieii own choice. In the former case they shall have as full powers and privileges as any other presbytery in the united body, and shall attach themselves to the synods most convenient.”
2. “ The theological seminary at Princeton, under the care of the general assembly, and the theological seminary of the Associate Eeformed church, shall be consolidated.”
3. “ Whereas moneys to the amount of between nine and ten thousand dollars, which were given to the general synod of the *92 Associate Beformed church, and of which the interest or product only was to be applied to the support of a theological seminary, was necessarily used in the current expenses thereof, which moneys so expended were assumed by the synod as its own debt at an interest of seven per centum; the united body agree to make a joint effort to re-pay the same, and will apply the interest accruing thereon, to the maintainance of a professorship of biblical literature in the seminary at Princeton, analagous to that which now exists in the Associate Beformed church, and until such professorship shall be established^ the said interest or product shall be used for the general purpose of the seminary.’-
4. “The theological library and funds belonging to the Associate Beformed church, shall be transferred, and belong to the seminary at Princeton.”
Immediately after this union the library and funds of the Associate Beformed church, and of their seminary, were transferred, and delivered over to the theological seminary at Princeton, where they have since remained.
The bill in this case is filed to recover the possession of said library and funds, and a compensation for the use of the library and interest on the funds. Such is the general state of the facts, apparent from the pleadings and evidence in the case. And although it is deeply to be regretted that causes of this kind should arise, yet the manner in which this has been conducted) shows clearly that the parties seek only for truth and justice, and it furnishes striking evidence that the lines which mark the rights of property may be so indistinct, that men of the purest morals and most enlightened judgments, may honestly differ as to their true position.
In the investigation of this subject, it is necessary to inquire,
1. Whether the Associate Beformed church, for whose use these books and funds were given, still exists ?
2. Whether they are still entitled to the use and enjoyment of those books and funds as they were before the union ? and,
8. Whether these complainants have made a proper case for the interference of this court, and whether they are the proper parties in court ?
*93 As to the first point, I think no serious doubt can exist. The answer upon this subject admits “that several of the Associate Reformed churches, under the care and supervision of the general synod of the Associate Reformed church at the time of the aforesaid union, refused to concur therein, but continued, and still continue separate and distinct from the Presbyterian church, retaining the name of the Associate Reformed Church. That certain of the said churches have united under the same church discipline and government, and are governed by one and the same synod or church judicatory, called the Associate Reformed synod of the state of New-York.” And in addition to this admission, all the witnesses speak of “the Associate Reformed church ” as an existing church.
The next inquiry is, whether they are still entitled to the use and enjoyment of these books and funds as they were before the union ? and this involves the important question as to the power or authority of the general synod to form this union.
The Associate Reformed church has existed in this country for many years, as a separate or distinct branch of the Christian church.
In the year seventeen hundred and ninety-six it was composed of several presbyteries, and one synod, called the “Associate Reformed synod,” which consisted of those presbyteries met together for mutual assistance, and for managing the affairs of the church under its care.
This form of government by presbyteries and one synod, continued until eighteen hundred and two, during all which time this associate synod was the supreme head of the church, as to its government and order. In eighteen hundred and two, the synod, by the assent of the presbyteries, resolved to -divide itself into four particular synods, and to form a general synod, which held its first meeting at Greencastle, in Pennsylvania, on the last Wednesday of May, eighteen hundred and four.
This general synod was composed of delegates from the several presbyteries, with powers expressly defined in their constitution ; and to that definition of their powers I refer, to ascertaii *94 their extent, with this remark, that their powers were delegated and not inherent.
By the seventh section of the sixth chapter of their chnrch ■government, it is declared that “ the general synod thus constituted, is in every respect to the particular synods, what the latter are to the presbyteries within their bounds. It is also the province of the general synod to decide questions respecting doctrine and discipline, to bear testimony against errors and immoralities, to correspond with other churches, and in general to preside over the religious interests of the church at large. But no regulation intended to be universal and permanent, shall be established without previously transmitting them to the several presbyteries, that they may have time to consider and report their judgment thereon.”
As this definition of the powers of the general synod refers to the power of the particular synods over the presbyteries within their bounds, it becomes necessary to inquire as to that j>ower.
By thé second section of the same chapter, after reciting a variety of specific powers, it is declared that they have power “ generally to make such regulations, with respect to presbyteries, sessions, and people under their care, as do not interfere with the established order of the church.”
It is, therefore, evident that the particular synod can do no act that shall “ interfere with the established order of the church;” and as the general synod is in every respect, to the particular synods,what the latter are to the presbyteries within their bounds, I conclude that their powers are not more extensive than those of the particular synod; unless upon a fair construction of some other part of the seventh section above quoted, that further powers can be inferred. These further powers are “ to decide questions of doctrine and discipline, to bear testimony against errors and immoralities, to correspond with other churches, and in general to preside over the religious interests of the church at large.” Here is no authority given to interfere with the established order of the church. And as to the last clause of said article respecting the establishment of regulations, which are intended *95 to be universal and permanent, I consider that as a limitation, ratlier than a grant of power.
From these premises, I conclude that the general synod had no authority to do any act, or make any regulation which should interfere with the established order of the church.
In order to apply this principle to the articles of union, it is necessary to examine those articles, and see if they do in fact interfere with the established order of the church. And in order to understand their true bearing, they are to be considered as valid, and of course obligatory upon the several presbyteries composing the general synod; and in that view, let us inquire what would have been their effect.
By the second article, the two seminaries are consolidated, and of course one of them ceased to exist.
By the fourth article, the theological library and funds belonging to the Associate Eeformed Church, are transfered, and belong to the seminary at Princeton, and consequently, it is the seminary of the Associate Eeformed church that ceased to exist.
By the third article, it appears that the general synod of the Associate Eeformed church had become indebted to their church in the sum of nine or ten thousand dollars, and by that article it is provided, “that the united body agree to make a joint effort to repay the same.” Here we find that the two churches are united and form but one body or church, and of course one of the churches must have ceased to exist, and the question is, which church survived ?
We have already seen, by the fourth article, that the theological library and funds of the Associate Eeformed church, are transferred, and belong to the seminary at Princeton; and by the second article, that the theological seminary of the Associate Eeformed church had ceased to exist, and therefore, it cannot he presumed, that the Associate Eeformed church survived, having already given away her library and funds.
But this view of the case is confirmed by the first section, which provides “ that the different presbyteries of the Associate *96 Reformed church, shall be amalgamated with those of the general assembly; or if they choose, they shall retain their separate organizations, in which case, they shall have as full powers and privileges as any other presbytery in the united body, and shall attach themselves to the synods most conve nientthus giving to a presbytery of the Associate Reformed church, the privilege of being attached to the most convenient Presbyterian synod, and to the general assembly.
Hpon a fair construction of these articles of union, it is mani fest that the Presbyterian church was the body that was to sur vive; and this was evidently the view taken of it by those who formed the union, for by reference to the minutes of their proceedings in May, eighteen hundred and twenty-two, after the adoption of the articles of union, I find that the general assembly of the Presbyterian church, invite all the delegates at the synod, to take their seats, as members of the general assembly, which is accepted; and it is resolved by the general synod of the Associate Reformed church, “that all the minutes and documents, together with a complete series of the published extracts belonging to the general synod, be, and they are thereby directed to be, by the clerk deposited with the session of the congregation of Spruce street church, subject to the future disposal of the general assembly of the Presbyterian church.”
It was the obvious intention of those who formed the union, and it is evident from the articles of union themselves, and the proceedings had thereon, that the Associate Reformed church should be merged in the Presbyterian church, to all intents and purposes; and such has been the fact, with regard to those who came in under the union ; and such would have been the effect, as to the whole church, if those articles of union had been considered by all as obligatory. By this act they not only interfere with the established order of the church, but actually destroy the church of which they are the highest judiciatory.
It has not been contended, nor do I think that it can be, that the ¡Dower of the general synod of the Associate Reformed church had this extent. Chancellor Dessasure very justly re *97 marks, “ that one of the fundamental rules of incorporate bodies is, that the members are not to do any act which may destroy its existence, or injure its privileges.” And the reason of the rule applies with equal force to voluntary associations.
I therefore conclude, that the union is invalid, and that the Associate Eeformed church still have the same rights and interest in these books and funds, that they had before the adoption of these articles of union.
But it was contended, that the general synod had a right to transfer this library and these funds to the seminary at Princeton, although they might not have had the right to form the union.
I do not think it necessary here to inquire,how far they had the power to dispose of this property; for I consider this transfer-of the books and papers, as a consequence of the union, and necessarily connected with it, in all its parts; they must stand or fall together. It cannot be supposed, that they intended to transfer this property as a distinct act, to beconsidered as valid, although the other parts of the agreement were void.
It only remains to inquire, whether the case presented, be a case jDroper for the interference of a court of equity; and whether these complainants are the proper parties to ask its aid.
The property in dispute was originally given for the benefit of the Associate Eeformed church, and held in trust for the purpose of erecting and maintaining a theological seminary for the education of youth.for the holy ministry, and also for a library for the use of the seminary. By the third section of the original resolution, under which Dr. Mason -was appointed, he was authorized and enjoined to solicit donations in money, for the purpose of “erecting and maintaining a theological seminary, for the education of youth for the holy ministry.” And by the fourth section, he was “ authorized to purchase a library for said seminary, and a collection of those books which are most needful and useful for this synod, to be distributed among tbeir ministers and students, as shall be directed,” «fee.
Under tírese resolutions, Dr. Mason obtained these donations. *98 and in his report, dated October twenty-sixth, eighteen hundred and two, after stating the amount of moneys received, he remarks, “ of the money, the principal part has been expended in the purchase of books, most of which are to be deposited in the libi’ary of the seminary; the rest may be disposed of by sale, as the synod shall direct, but cannot be given away, unless their price be replaced, as the whole of the pecuniary donations were made to the. seminary exclusively.”
And the synod themselves, when applied to by the Lexington academy, for part of these books, resolve, “ that they cannot, consistently with good faith, divide the moneys contributed expressly to the seminary they have now instituted nor the library purchased with part of those moneys.”
It is, therefore, manifest that this property was trust property, and that neither Dr. Mason, nor any other person into whose hands it might come, had a right to apply it to any other purpose than that for which it was originally intended; and it is the duty of' this court, upon a proper application, to see that this trust is not abused.
Let us, then, inquire if these complainants are the proper parties to ask relief in this case. At the time of the acquisition of this property, the Associate Reformed church existed under the same organization that it now exists; but since that time, various parts have separated from the original church, and thereby lost all right and title which they had to this property; for it is a well settled principle, that when part of any religious association separate and establish a new society, they cease to be members of the original society, and have no longer any claim to their property. In eighteen hundred and twenty, the synod of Scioto separated from the original church, and the congregations oi the presbytery of Big Spring, which were opppsed to the union, afterwards attached themselves to that synod. In eighteen hundred and twenty-one, the synod of the Carolinas separated, and by the union a large portion of the church united themselves with the Presbyterian church; but a great majority of the churches in the state of New York, refused to concur in the *99 union, and they now consist of more than thirty congregations, under the government of the synod of New York, retaining their separate existance, in the established form and order of the Associate Eeformed church; they have a theological seminary established at Newburgh, in connection with and maintained by the church, and this is the identical church for whose use this property was originally given. Who, then, should appear and claim the aid of this court, to restore this property to the use for which the doners intended it ?
The general synod is not incorporated, and therefore, cannot act as trustees for this purpose. But the complainants are incorporated, and may be trustees and hold this property for the use of the church, provided the act by which they were incorporated gives them such authority. By the bill it appears, and it is admitted by the answer, that they are entitled “ to the privileges of taking into their possession and custody, all the temporalities belonging to their churches, whether the-same consist of personal or real estate ; and whether the same shall have been given, granted, or devised, directly to their church, or to any other person for their use; and of sueing or being sued, by their corporate name or title, in all courts of law or equity; and ■of recovering, holding, and enjoying all the debts, demands, rights and privileges, and estates, belonging to their churches, in whatsoever name the same may have been acquired,” &c.
The bill also charges, and it is admitted in the answer, “ that there are now in the state of New York, seventeen other Associate Eeformed churches, also incorporated under, and according to the provisions of the said act, associated with the complainants, professing the same articles of faith, the same church discipline and government, and governed by one and the same synod or church judicatory, called the Associate Eeformed synod of New York, and forming and comprising a distinct body or sect of Christians under the general denomination of “ the Associate Eeformed church.”
If these different congregations, forming the Associate Eeformed church, had not become incorporated, it would have been *100 competent for any person belonging to that church, on behalf of himself and all others belonging to that church, and entitled to the use of those books and funds, to have enforced the execution of that trust in this court.
In the case of Chancey v. May, Prec. in Chan. 592, the court sustained a bill filed by the treasurer and manager of certain brass works, on behalf of themselves and all. other proprietors and owners, against the late treasurer and manager, to call them to account for the misapplication of funds.
The case of Fells v. Read, 3 Ves. 69, establishes the same doctrine.
And in the case of Beatty and Ritchie v. Kurtz and others, 2 Peters, 566, 579, the bill was filed by the complainants, alleging themselves to be trustees and agents for the German Lutheran church, on behalf of themselves and the members of the said church; and it was sustained, although the church had never been incorporated.
If, then, it would have been competent for the members, individually, to have enforced the execution of this trust, for the-benefit of the whole, I can imagine no good reason why they should not be authorized to form themselves into corporations,, for the purpose of more conviently asserting and enforcing those rights which they had, and could assert in their individual-capacity.
In the case of the Presbyterian church of Bethel v. the Executors of Dounom, 1 Eq. R. 154, “ the funds were collected by voluntary subscription, to uphold a church and parsonage,, for the use of the congregation and ministers, near Poupon river.” This church was not incorporated at the time; Tames Dounom, the surviving trustee, who had possession of. the property for a long time, attempted, by his will, to divide it, and to. divert a part of it for the use of another church. The com plainants afterwards became incorporated, and filed their bil against the executors of Dounom, for an account of the property and the court were of opinion “ that Dounom had no right to divert the funds of the society to different purposes than what *101 they were originally intended for;” and they decreed “that the funds should be assigned over to the complainants, for the benefit of the Bethel church.”
And in the case of the Canajoharie church v. Leiber, 2 Paige, 43, the complainants and others, associated for the purpose of building a church, and the defendant agreed to give a lot for the purpose; voluntary subscriptions were raised, and a church built on the premises. Afterwards, the associates were incorporated, and filed the bill in their corporate name; and the chancellor remarked, “ that although the agreement to convey this lot was made before the society was incorporated, yet in equity the agreement ought to be carried into effect with the incorporation, which now represents the rights of the orignal associates.”
These authorities confirm the view which I have taken of the case, and satisfy me that these complainants are the proper parties in court; and that they are authorised to receive these books and funds, and to hold them in trust for the use of the church, according to the intention of the donors.
Decree accordingly.